**Bill W. FAUST, Appellant–Respondent,**

v.

**RYDER COMMERCIAL LEASING & SERVICES f/k/a Ryder Truck Rental, a division of Ryder Systems, Inc., Respondent–Appellant.**

Nos. WD 52481, WD 52513.

Missouri Court of Appeals, Western District.

Aug. 5, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 30, 1997.

Application to Transfer Denied Nov. 25, 1997.

Dennis E. Egan, James S. Margolin, Kansas City, for Appellant–Respondent.

John M. Edgar, Robert J. Hoffman, Kansas City, for Respondent–Appellant.

Before ULRICH, C.J., P.J., and LOWENSTEIN and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

Bill W. Faust (appellant), a former employee of Ryder Commercial Leasing & Services (respondent), in his first amended petition, sought damages against respondent in five counts for: Count I—Wrongful Retaliatory Discrimination and Discharge in Violation of Public Policy; Count II—Breach of Contract; Count III—Promissory Estoppel; Count IV—Fraudulent Misrepresentation; and, Count V—Negligent Misrepresentation. Counts II–V were dismissed by the trial court pursuant to respondent's motion to dismiss at the close of appellant's evidence. Count I was submitted to the jury in a bifurcated proceeding with the jury returning a verdict in the first phase for appellant for compensatory damages in the amount of $530,250 and finding respondent was liable for punitive damages. In the punitive damage phase, the jury returned a verdict assessing punitive damages of $4 million. Respondent filed a motion for judgment notwithstanding the verdict (JNOV), new trial, and remittitur. The trial court sustained respondent's motion for JNOV, finding that Missouri had not yet recognized a public policy "whistleblower" action based on facts as pled and proven by appellant, but overruled respondent's motion for new trial and remittitur.

In his appeal, appellant raises three points. In Point I, he alleges that the trial court erred in sustaining respondent's motion for JNOV on Count I because his whistleblower claim was not an extension of the public policy exception to the employment-at-will doctrine, but was simply a new factual pattern. In Points II and III, appellant alleges that the trial court erred in sustaining respondent's motion for directed verdict at the close of appellant's evidence as to Counts III–V because he had made a submissible case as to all three counts.

In its cross-appeal, respondent raises five points. Points I and II deal with alleged instructional error in submitting appellant's Count I claim. Points III and IV deal with the appropriate measure of damages the jury should have been allowed to consider under Count I. Point V alleges that the trial court erred in denying respondent's motion for remittitur.

As to appellant's appeal, we affirm. As such, the claims raised in respondent's cross-appeal are rendered moot.

## Facts

Before he resigned on December 5, 1991, Bill Faust (appellant) was employed by Ryder Commercial Leasing & Services (respondent) for approximately twenty years, having started his employment on April 5, 1971. Appellant felt compelled to resign because of acts of retaliation for his reporting of alleged criminal activity, stealing from respondent, by Norm King, District Maintenance Manager for respondent's facilities in Kansas and Missouri, and Huey Farris, District Manager for the Midwest Division of Ryder. In subsequent employment applications, appellant gave his reason for leaving respondent as he

wanted to try something else or left for a better job.

When appellant resigned, he was employed as a tire technician and mechanic at respondent's Lenexa, Kansas, location, although from time to time he worked and trained tire technicians and mechanics at other locations in Kansas and Missouri. Appellant had been at the Lenexa location since 1988. His supervisor at the Lenexa location was Bill Klinksick. Appellant was, by all accounts, an excellent employee, receiving superior employee evaluations, until immediately after a confrontation with King regarding suspected stealing of company property by King and Farris. Because he was highly thought of by management, appellant was the only non-managerial employee appointed to serve on respondent's Continuous Improvement Process Evaluation Committee (CIPEC), a program designed to consider employees' ideas for improving the company.

In September 1991, after a meeting of the CIPEC, appellant privately confronted King with his belief that King and Farris were stealing from the company and threatened to expose them to "Ryder corporate officials and/or authorities if the stealing didn't stop." King responded by saying, "You ever mention that again to anybody, and that's going to be your career choice." Appellant's stated purpose for his confrontation with King was to give King and Farris an opportunity to stop their stealing before he exposed them. Appellant did not mention his concerns about King and Farris to the CIPEC. He did not confront Farris with his allegations nor did he report his suspicions to company security, company auditors, or King's and Farris' superiors until after he had resigned. Appellant testified he did not know the proper procedure for reporting up the chain of command. He did advise Bill Klinksick about the stealing in the spring of 1991.

In the spring of 1992, after his resignation from respondent, appellant contacted Harry Rosenfeld, the head auditor at respondent's corporate headquarters in Miami, regarding the alleged criminal activities of King and Farris. In return for his cooperation with an audit, appellant told Rosenfeld that he wanted his job back with back pay and an apology

letter. Rosenfeld responded by saying, "Sounds fair to me." In subsequent conversations, Rosenfeld assured appellant he was going to get his job back for cooperating with the audit. Appellant cooperated fully with the audit, which ultimately resulted in King's and Farris' termination. Appellant was never rehired and did not receive a letter of apology. His long-distance telephone bills incurred in cooperating with the audit were paid by respondent.

Within forty-eight hours of his confrontation with King, King began making complaints about appellant's job performance. King told Donald Racinowski, a former district manager, that they "were going to put a silver bullet" in appellant. Shortly after the confrontation, King made a claim that appellant was defrauding the Bridgestone tire warranty program by improperly measuring tread depths and removing Department of Transportation (DOT) numbers from Bridgestone tires in violation of company policy and federal regulations. Appellant denied any wrongdoing, and insisted he was following company policy. A report concerning the Bridgestone allegations against the appellant was sent by Getty Faul, National Tire Manager, to Farris, with copies to Ed Justis, Regional Vice President, Ike Luna, Director of Maintenance, and several other high-level management employees within the company.

As a result of the DOT allegation, the appellant went to the Missouri Highway Patrol station in Lee's Summit to determine for himself whether the removal of the DOT numbers from the tires was a violation of federal regulations as claimed by King. While there, he mentioned his suspicions regarding stealing by King and Farris. He admitted, however, that he did not advise the trooper he talked to of the name of his company nor was he certain he gave him King's and Farris' full names. He also called the DOT to inquire about the application of any regulations concerning the removal of the DOT numbers from the tires.

After his confrontation with King, appellant was eventually stripped by him of certain job duties, i.e., warranty work and training, and was not allowed to use the telephone on his desk. As a result of these events and

the allegations as to the Bridgestone tire program, appellant was under a great deal of pressure and found it increasingly difficult to perform his job duties. He also feared that he would soon be discharged. As a result, he made the decision to resign.

Upon resigning from respondent, appellant went to work as a field engineer for Goodyear Tire & Rubber Co., a job he had obtained prior to his resignation from respondent. When appellant left the employ of respondent, he was making $14 per hour plus benefits and hoped to retire at age fifty-two. At Goodyear, he had a monthly guarantee of $2,500 per month for six to eight weeks and the use of a company vehicle. In February, 1992, while appellant was still employed by Goodyear, at King's urging, appellant made application to respondent for rehire. The application contained the following certification of appellant:

> If an employee relationship is established, I understand that such employment is terminable at will by either myself or the company at any time for any reason. I also understand that any period of employment is not for specific duration. In addition, I understand that, with the exception of the chief executive officer of Ryder System, Inc., no company representative has the authority to make any oral or written agreements which are contrary to the foregoing.

Appellant advised King he would not apply for rehire unless King assured him that the stealing would stop. King told him to go see Bill Klinksick to fill out an application. Appellant was not rehired.

Appellant left Goodyear after three and one-half months and went to work for KCR International as a line mechanic making $11 per hour. Appellant left KCR International after three and one-half months even though he was offered a $3 per hour raise and a promotion. He testified that when he left Goodyear and KCR, he thought he was going back to work for respondent. Appellant then went to work for MFA Propane for a short period of time making $1,100 per month. When he left MFA, he went to work for Fry–Wagner for $12 per hour. After approximately two years there, he was making $14

per hour, but quit and went to work for UPS Leasing for $12.50 per hour because of its "outstanding" benefits.

Although the record does not reflect the exact date, appellant filed suit against respondent sometime in 1993. Thereafter, he filed his first amended petition seeking damages against respondent, King and Farris, in five counts for: Count I—Wrongful Retaliatory Discrimination and Discharge in Violation of Public Policy; Count II—Breach of Contract; Count III—Promissory Estoppel; Count IV—Fraudulent Misrepresentation; and, Count V—Negligent Misrepresentation. King and Farris were voluntarily dismissed out by appellant prior to trial.

The jury trial of appellant's first amended petition commenced in the Circuit Court of Jackson County on October 30, 1995, and concluded on November 13, 1995. Counts II–V were dismissed by the trial court pursuant to respondent's motion to dismiss at the close of appellant's evidence. Count I was submitted to the jury in a bifurcated proceeding with the jury returning a verdict in the first phase for appellant for compensatory damages in the amount of $530,250 and finding respondent was liable for punitive damages. In the punitive damage phase, the jury returned a verdict assessing punitive damages of $4 million. Respondent filed a motion for JNOV, new trial, and remittitur. The trial court sustained respondent's motion for JNOV, finding that Missouri had not yet recognized a public policy "whistleblower" action based on facts as pleaded and proven by appellant, but overruled respondent's motion for new trial and remittitur. This appeal and cross-appeal followed.

### Faust's Appeal

### Standard of Review

We will affirm the trial court's JNOV only if the plaintiff failed to make a submissible case. *Jungerman v. City of Raytown,* 925 S.W.2d 202, 204 (Mo. banc 1996); *Budding v. Garland Floor Co., Inc.,* 939 S.W.2d 419, 421 (Mo.App.1996). Likewise, in reviewing the granting of a motion for directed verdict in favor of the defendant, we review to determine if the plaintiff made

a submissible case. *Rustici v. Weidemeyer*, 673 S.W.2d 762 (Mo. banc 1984); *Friend v. Holman*, 888 S.W.2d 369, 371 (Mo.App.1994). In reviewing for a submissible case, we view the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences that can be drawn from the evidence, while disregarding all unfavorable evidence and inferences. *Jungerman*, 925 S.W.2d at 204; *Friend*, 888 S.W.2d at 371. If a JNOV is based on an issue of law, we review the trial court's conclusions *de novo*. *Jungerman*, 925 S.W.2d at 204. We will affirm the trial court's judgment if its decision is supported by any one of the grounds set forth in respondent's motion for JNOV. *Budding*, 939 S.W.2d at 421. Where the trial court fails to state the reason for its dismissal, the appellate court presumes it was granted on the basis of one of the grounds stated in the motion to dismiss. *Mission Med. Group, P.A. v. Filley*, 879 S.W.2d 743 (Mo.App.1994). There is a presumption which favors reversal of a JNOV or directed verdict granted the defendant, unless the favorable evidence and inferences are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to the result. *Thoroughbred Ford, Inc. v. Ford Motor Co.*, 908 S.W.2d 719, 728 (Mo.App.1995); *Friend*, 888 S.W.2d at 371.

## I. Wrongful–Retaliatory Discharge

In his first point, appellant alleges that the trial court erred in sustaining respondent's motion for JNOV as to the jury's verdict for him on his claim for wrongful-retaliatory discharge under the public policy exception to the employment-at-will doctrine. We disagree.

In Count I of his amended petition, appellant alleged that, although not actually discharged, he was "constructively" discharged in that he was driven out of his employment with respondent by the actions of two superiors, King and Farris, who were retaliating against him because he had reported to King that he believed King and Farris were involved in stealing from respondent and that their wrongful actions had to cease or he would report their wrongdoing to corporate officials and authorities. Appellant bases his wrongful-retaliatory discharge claim on the "public policy" exception to the employment-at-will doctrine. Respondent asserted in its motion for JNOV that appellant could not maintain a wrongful-retaliatory discharge claim under the public policy exception on the facts pled and proven. The trial court agreed and sustained respondent's motion for JNOV

for the reason that [appellant's] pleadings and evidence did not support a finding that a clear mandate of public policy was violated by [appellant's] constructive discharge. Rather, his allegations and evidence related solely to internal matters not encompassed by Missouri's public policy. See enumerated paragraphs 1 through 5 of defendant's Motion for Judgment Notwithstanding the Verdict.

Paragraphs 1 through 5 of respondent's motion state as follows:

1. Missouri does not recognize [appellant's] purported cause of action for wrongful discharge in violation of public policy. *See Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 663 (Mo. Banc 1988).

2. The "narrow" public policy exception which is now presumed to exist in Missouri does not extend to claims like [appellant's] where there is no allegation that the discharge was violative of any statute specifically prohibiting discharge of an employee for an enumerated reason. *See Clark v. Beverly Enterprises—Missouri, Inc.*, 872 S.W.2d 522, 524 (Mo.App.1994) (discharge allegedly violated § 198.070.10 RSMo.).

3. [Appellant's] allegations and proof did not fall within the scope of the "narrow" public policy exception which is currently presumed to exist in Missouri because that exception does not encompass alleged "whistleblowing." *Crockett v. Mid–America Health Services*, 780 S.W.2d 656, 658 (Mo.App.1989). [Appellant's] allegations and evidence were insufficient to support a verdict in his favor because there was no evidence Ryder required conduct of [appellant] that would have amounted to a violation of a statute, constitutional provision or regulation.

4. [Appellant's] pleadings and evidence did not support a finding that a clear

mandate of public policy was violated by [appellant's] discharge. Rather, his allegations and evidence related solely to internal matters not encompassed by Missouri's public policy.

5. [Appellant's] allegations and evidence did not support a finding that he reported to his employer or public authorities conduct by his employer which constituted a violation of any legal provision. Accordingly, [appellant's] pleadings and proof did not make a submissible case on Count I of his First Amended Petition and Ryder is entitled to judgment as a matter of law.

Thus, we must decide whether the appellant, under the evidence viewed in a light most favorable to his verdict, made a submissible case for wrongful-retaliatory discharge against respondent based upon a public policy exception to the employment-at-will doctrine.

"Employees who do not have a contract for a definite period of time are considered 'employees-at-will.' *Amaan v. City of Eureka,* 615 S.W.2d 414, 415 (Mo. banc 1981), *cert. den.,* 454 U.S. 1084, 102 S.Ct. 642, 70 L.Ed.2d 619 (1981)." *McCloskey v. Eagleton,* 789 S.W.2d 518, 519 (Mo.App.1990). "Under Missouri's employment at will doctrine an employer can discharge—for cause or without cause—an at will employee who does not otherwise fall within the protective reach of a contrary statutory provision and still not be subject to liability for wrongful discharge." *Dake v. Tuell,* 687 S.W.2d 191, 193 (Mo. banc 1985). However, a narrow, public policy exception has been carved out to the employment-at-will doctrine. *Adcock v. Newtec, Inc.,* 939 S.W.2d 426, 428–29 (Mo.App.1996); *Shawcross v. Pyro Prod., Inc.,* 916 S.W.2d 342, 343 (Mo.App.1995); *Adolphsen v. Hallmark Cards, Inc.,* 907 S.W.2d 333, 336 (Mo. App.1995); *Lynch v. Blanke Baer & Bowey Krimko, Inc.,* 901 S.W.2d 147, 150 (Mo.App. 1995); *Cole v. Conservation Com'n,* 884 S.W.2d 18, 21 (Mo.App.1994); *Clark v. Beverly Enterprises–Missouri, Inc.,* 872 S.W.2d 522, 525 (Mo.App.1994); *Kirk v. Mercy*

*Hosp. Tri–County,* 851 S.W.2d 617, 619 (Mo. App.1993); *Beasley v. Affiliated Hosp. Prod.,* 713 S.W.2d 557, 560–61 (Mo.App.1986); *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 871 (Mo.App.1985). Although the Missouri Supreme Court has not specifically adopted the public policy exception by name, it effectively established it in *Smith v. Arthur C. Baue Funeral Home,* 370 S.W.2d 249, 254 (Mo.1963), and appeared to accept its expansion when in *Johnson, supra,* it referred to the exception, but did not condemn or overturn the appellate decisions expanding it. *Johnson,* 745 S.W.2d at 663; *Adolphsen,* 907 S.W.2d at 336.[1] Since *Johnson,* the Missouri Supreme Court in *Luethans v. Washington University,* 894 S.W.2d 169, 171 (Mo. banc 1995), again referred to the exception without condemning or overturning it.

The rationale for the public policy exception is that while there may be a right to discharge an employee at-will for no reason, " 'there can be no right to terminate . . . for an unlawful reason or purpose that contravenes public policy.' " *Petersimes v. Crane Co.,* 835 S.W.2d 514, 516 (Mo.App. 1992).

> The significance of the public policy exception is that it protects "a myriad" of employees without the bargaining power to command employment contracts and are "entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers."

*Clark,* 872 S.W.2d at 525. The exception provides that:

> [w]hen the discharge of an at-will employee violates a clear mandate of public policy, this court has determined that the employee has a wrongful discharge claim. [*Petersimes v. Crane Co.,* 835 S.W.2d 514, 516 (Mo.App.1992) ].

*Shawcross,* 916 S.W.2d at 343. The term "public policy" has generally been defined in Missouri as a legal principle stating that "no one can lawfully do that which tends to be injurious to the public or against the public

---

1. For a contrary view, *see Komm v. McFliker,* 662 F.Supp. 924 (W.D.Mo.1987), in which the court rejects the holding in *Boyle,* 700 S.W.2d at 871. The *Komm* court held that *Boyle* did not reflect current Missouri law, and that absent a contrary statutory or contractual provision, a whistleblower action for wrongful discharge could not be maintained. *Komm,* 662 F.Supp. at 925.

good." *Boyle,* 700 S.W.2d at 871, *quoting Brawner v. Brawner,* 327 S.W.2d 808, 812 (Mo.1959), *cert. denied,* 361 U.S. 964, 80 S.Ct. 595, 4 L.Ed.2d 546 (1960).

The courts of this state have recognized four categories of cases under the public policy exception: (1) discharge of an employee because of his or her refusal to perform an illegal act; (2) discharge because an employee reported violations of law or public policy to superiors or public authorities; (3) discharge because an employee participated in acts that public policy would encourage, such as jury duty, seeking public office, asserting a right to collective bargaining, or joining a union; and (4) discharge because an employee filed a worker's compensation claim. *Lynch v. Blanke Baer and Bowey Krimko, Inc.,* 901 S.W.2d 147, 150 (Mo.App.1995).

*Shawcross,* 916 S.W.2d at 343. Appellant's claim for wrongful retaliatory discharge was pled, argued, and submitted to the jury on a public-policy-category (2) theory, commonly referred to as the "whistleblower" category, specifically that he blew the whistle on King and Farris to his employer, respondent, by reporting to King his suspicions as to King's and Farris' stealing from respondent. Thus, on appeal, appellant is bound by this theory. *Thurmon v. Ludy,* 914 S.W.2d 32 (Mo.App. 1995); *Johnson v. Rival Mfg. Co.,* 813 S.W.2d 78 (Mo.App.1991). Our review then is limited to whether appellant made a submissible case on a claim for wrongful-retaliatory discharge based on a public-policy-whistleblower theory as pled, argued, and submitted by appellant at trial.

Respondent contends that the facts pled and proven by appellant at trial did not, as a matter of law, place his cause of action within the whistleblower category of the narrow public policy exception to the employment-at-will doctrine, and that to allow him to maintain an action for wrongful-retaliatory discharge, the law as to the exception would have to be expanded. Specifically, respondent argues that appellant could not maintain an action for whistleblowing because he did not plead and prove that: (1) his reporting was required by constitutional provision, statute or regulation; (2) respondent was a "perpetrator," rather than a "victim" of the reported, alleged theft; (3) his reporting to his supervisor, King, his suspicions of King's and Farris' theft from respondent constituted "whistleblowing" in the legal sense; (4) he was actually discharged by respondent, as opposed to being constructively discharged; and, (5) his employment relationship was a Missouri employment relationship subject to protection under Missouri's public policy exception. Appellant contends that, although his is a new "factual pattern," heretofore not specifically recognized · by our appellate courts as a "whistleblower" fact pattern under the public policy exception, it does fit within the recognized framework of the exception. Because we choose to decide this appeal on the limited issue of whether appellant's reporting to King was tantamount to "blowing the whistle" sufficient to invoke the public policy exception, we neither address nor decide respondent's four other assertions as to the factual application of appellant's claim under the public policy exception.

As to whistleblowing, appellant's theory at trial was not one of liability predicated on whistleblowing to a third party, commonly referred to as "external whistleblowing," but on whistleblowing to respondent, his employer, commonly referred to as "internal whistleblowing." Thus, we must decide whether the reporting of wrongdoing or misconduct by a wrongdoer to the wrongdoer, who is also the whistleblower's supervisor, constitutes internal whistleblowing which will support a claim of wrongful-retaliatory discharge under the public policy exception to the employment-at-will doctrine.

To decide the issue we have identified, we must logically look at the clear mandate of public policy which is implicated in encouraging employees to come forward and report criminal activity by co-employees. As pled by appellant in his amended petition, in Missouri the theft of property from another, including one's employer, is a violation of criminal law. We would not quarrel with the fact that public policy would clearly encourage employees to report suspected criminal activity by co-employees to the proper authorities in order to "expose" the wrongdoers and their wrongdoing · to prevent further

wrongdoing and to aid in the investigation and criminal prosecution of the wrongdoers. *See Sanders v. Daniel Intern. Corp.*, 682 S.W.2d 803, 806 (Mo. banc 1984) (although not addressing the issue of an employee reporting internal theft to an employer, in addressing the public policy of reporting criminal activity in general, the Missouri Supreme Court stated that "[t]here is almost universal agreement that sound public policy dictates that the law should encourage the uncovering and prosecution of crime," and that "[a]ny 'policy that discourages citizens from reporting crime or aiding in prosecution would be undesirable and detrimental to society in general.'" Citing *Cates v. Eddy*, 669 P.2d 912, 917–18 (Wyo.1983).) And, if an employee did, in fact, carry out this public policy mandate by reporting suspected criminal activity to the proper authorities, the employee whistleblower should not be subjected to the loss of his or her job. This is the bedrock on which the public policy exception was created. Fatal to appellant's claim here, however, is the fact that the clear mandate of public policy identified is not carried out by his reporting to King appellant's suspicions regarding criminal activity by King and Farris.

▮ In order to effectuate the clear mandate of public policy implicated in a given situation, it is axiomatic that the at-will employee report or "blow the whistle" to the proper authorities, which, depending on the circumstances, would include the employer, "internal whistleblowing," and/or a third-party authority, "external whistleblowing." *Adcock*, 939 S.W.2d at 429. Here, for purposes of the public policy exception, we find that the appellant's reporting to King his suspicions as to King's and Farris' criminal wrongdoing did not constitute reporting or whistleblowing. We base this on the fact that appellant's reporting to King appellant's suspicions did not "expose" King and Farris or their criminal activity. At best, as appellant admitted at trial, it was a *courtesy warning* intended to give King and Farris an opportunity to stop their criminal activity without being exposed. While such a courtesy warning may be viewed as compassionate and in some instances have the intended effect of stopping future criminal activity, it does not expose wrongdoers and their past wrongdoing. It allows wrongdoers to escape detection and avoid prosecution for past wrongdoing, while in no way affording the victims an opportunity to protect themselves from further wrongdoing, all contrary to the clear mandate of public policy implicated here. Or in other words, by definition, by reporting to the wrongdoer, there is no blowing of the proverbial whistle and the public policy mandate goes wanting.

▮ Because the protection afforded by the public policy exception is only extended where a clear mandate of public policy is effectuated and because that did not occur here, we find appellant did not, as a matter of law, make a submissible case for wrongful-retaliatory discharge under the public policy exception to the employment-at-will doctrine based on his reporting to King as pled, argued and submitted to the jury. The lesson of this case, as it was in *Adcock, supra*, is that to succeed on a claim under the public-policy-whistleblower exception, plaintiff must not only plead, submit, and prove to the trier of fact that his or her discharge was directly and exclusively caused by his or her whistleblowing, but in addition, that this "whistleblowing" actually occurred in that he or she reported the alleged criminal wrongdoing to the proper authorities, which, as we hold here, does not include the wrongdoer.

In his brief in reply to respondent's argument that reporting the alleged criminal wrongdoing of King and Farris to King did not constitute whistleblowing sufficient to invoke the public policy exception, appellant argues that he did report to someone other than King, specifically Bill Klinksick, branch maintenance manager for respondent in Lenexa, Kansas, and the Missouri Highway Patrol. Even if we were to assume, *arguendo*, that such reports under the facts and circumstances of this case would invoke the exception, appellant's argument is of no help at this late date. Appellant's claim was pled, argued, and submitted to the jury on a theory of wrongful-retaliatory discharge under the public-policy-whistleblower exception to the employment-at-will doctrine predicated on his report to King, not on any other report. Thus, on appeal, he is bound by this

theory at trial, *Johnson,* 813 S.W.2d at 78; *Thurmon,* 914 S.W.2d at 32. Appellant chose to live or die on a wrongful-retaliatory discharge claim based on his report to King, which choice we find herein to have been fatal. He cannot now on appeal try to resurrect his claim by arguing that he could have in hindsight successfully framed it otherwise.

■ Although appellant contends in his brief that no expansion of the public policy exception by this court is necessary to accommodate his claim as pled, submitted, and proven, we note that even if expansion had been requested in order to avoid the result here, such request would have been denied. The necessity of the public policy exception to the employment-at-will doctrine is undeniable. As stated, *supra,* the exception protects " 'a myriad' of employees without the bargaining power to command employment contracts and are 'entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers.' " *Clark,* 872 S.W.2d at 525. However, it must be remembered that the Missouri Supreme Court has emphatically declared Missouri to be an employment-at-will doctrine state, *Dake, supra,* and *Johnson, supra,* and that the public policy exception to the doctrine, which was fashioned by the Missouri Court of Appeals and never expressly approved and adopted by the Missouri Supreme Court, is a narrow and limited exception, *Adolphsen,* 907 S.W.2d at 336; *Cole,* 884 S.W.2d at 21; *Boyle,* 700 S.W.2d at 878, which should not be expanded without clear justification. As our discussion, *supra,* would indicate, the reporting of criminal wrongdoing to the wrongdoer does not logically fit within the framework of the exception as "whistleblowing," such framework being structured to meet a clear mandate of public policy implicated in a given factual situation. Thus, expansion of the exception to include reports of criminal wrongdoing to the wrongdoer himself or herself simply is illogical.

Under our standard of review, we are to affirm the trial court's sustaining of respondent's motion for JNOV if we can do so on any ground set forth in the motion. *Budding,* 939 S.W.2d at 421. Because we find, as

the trial court did, that, as a matter of law, the appellant did not make a submissible case for wrongful-retaliatory discharge under the public policy exception to the employment-at-will doctrine on the facts pled and proven when viewed in a light most favorable to him, we must affirm its grant of respondent's motion for JNOV on appellant's Count I claim of his first amended petition.

Point denied.

## II. Promissory Estoppel

In his second point, appellant alleges that the trial court erred in directing a verdict for respondent on appellant's claim for promissory estoppel as pled in Count III of his first amended petition. He further alleges that the court erred in excluding certain evidence as to this claim, which would have allowed its submission to the jury. As a basis for his promissory estoppel claim, appellant claimed that Harry Rosenfeld, head corporate auditor for respondent, who conducted an audit into the alleged wrongdoing of King and Farris, promised, in return for appellant's cooperation with his audit, that he would be rehired by respondent. In this respect, appellant argued that Rosenfeld had apparent authority to make the promise of rehire and that evidence of his authority was improperly excluded by the trial court.

■ Initially we note that respondent contends that appellant did not preserve this issue for appeal in that he failed to file a motion for new trial. This contention is without merit in that Rule 72.01(c)(2), controls, which provides:

The party whose judgment has been set aside on the motion for judgment notwithstanding verdict, may upon appeal from the resulting adverse judgment, in addition to urging that the trial court erred in sustaining the motion for judgment notwithstanding the verdict, **also brief and argue and the appellate court may determine, whether the appellant is, in any event, entitled to a new trial.**

(emphasis added). Thus, under this rule, appellant was not required to file a motion for new trial to preserve his claim here.

█ Appellant's claim is controlled by the holding in *Rosatone v. GTE Sprint Communications,* 761 S.W.2d 670 (Mo.App.1988). In *Rosatone,* the Eastern District of this court held that, as a matter of law, the promise to hire an at-will employee could not form the basis for a claim of promissory estoppel, regardless of the nature of the damages plaintiff claims as a result of his or her reliance. *Id.* at 674. In so holding, the court relied on the holding in *Morsinkhoff v. De-Luxe Laundry & Dry Cleaning Co.,* 344 S.W.2d 639, 643–44 (Mo.App.1961). In stating the reasoning for its holding, the court in *Rosatone* quoted from *Morsinkhoff,* as follows:

> If an employee, under an oral contract of employment for an indefinite period, is without remedy when fired without reason, one day or one week after commencing work, is it logical to hold he is entitled to damages if the employer refuses to allow him to commence work at all under the agreement? We think not....
>
> ....
>
> .... To allow recovery of damages for breach of an oral contract of employment for an indeterminate period, either before or after entry thereupon, would be to overrule a long line of decisions which hold exactly the opposite.

*Rosatone,* 761 S.W.2d at 672, citing *Morsinkhoff,* 344 S.W.2d at 643–44. The court in *Morsinkhoff* characterized the plaintiff's claim of promissory estoppel based on the defendant's failure to hire him as promised as nothing more than an attempt to "outflank" the employment-at-will doctrine. *Rosatone,* 761 S.W.2d at 673; *Morsinkhoff,* 344 S.W.2d at 639.

Like in *Rosatone* and *Morsinkhoff,* appellant here did not allege detrimental reliance on a promise of employment for a definite term. Thus, the promise in question was a promise of employment at-will. *Rosatone,* 761 S.W.2d at 672. And, although respondent attempts to distinguish *Rosatone* and *Morsinkhoff* from his case, we find no merit in his attempts.

Because we find *Rosatone* and *Morsinkhoff* to be controlling, we hold, as a matter of law, that the appellant could not make a submissible case on a claim of promissory estoppel as pled in Count III of his first amended petition, even if we accept as true all the evidence and inferences he asserts in support of his claim, including the evidence he contends was erroneously excluded.

Point denied.

## III. Intentional and Negligent Misrepresentation

In his third point, appellant claims that the trial court erred in directing a verdict for respondent on appellant's claims for intentional and negligent misrepresentation and in excluding certain evidence in support of these claims. Appellant contends that the promise of respondent's auditor, Rosenfeld, that appellant would be rehired if he cooperated with the audit, forms the basis for appellant's claims of misrepresentation. He argues that Rosenfeld either intentionally misrepresented the rehire by telling appellant that the deal had already been approved by his superiors or negligently misrepresented the rehire by indicating to him that he had the authority to cause his rehire in return for his cooperation, when, in fact, he did not.

As in Point II, *supra,* we initially note respondent's argument that appellant failed to preserve this issue for appeal in failing to file a motion for new trial. As in Point II, Rule 72.01(c)(2) controls. Again, under this rule, appellant was not required to file a motion for new trial in that he was not an aggrieved party until respondent's motion for JNOV was granted. Thus, we will review appellant's claim.

█ To make a submissible case for intentional or negligent misrepresentation, the plaintiff must show "reliance" on a representation which proximately caused the damages claimed. *Hanrahan v. Nashua Corp.,* 752 S.W.2d 878, 883 (Mo.App.1988); *Colgan v. Washington Realty Co.,* 879 S.W.2d 686, 689 (Mo.App.1994). In this respect, the lesson of *Morsinkhoff* and *Rosatone, supra,* is clear, no damages can flow from the plaintiff's misplaced "reliance" on a promise to hire as an at-will employee, regardless of the creative theory delineated in order to "out-

flank" the employment-at-will doctrine. *See also Alfano v. AAIM Management Ass'n,* 770 S.W.2d 743, 745 (Mo.App.1989); *Hanrahan,* 752 S.W.2d at 883–84. Thus, as a matter of law, claims of intentional and negligent misrepresentation, which are predicated on reliance, will not lie where the reliance is based on a promise to hire as an employee at-will.

Because we find the reasoning of *Rosatone* and *Morsinkhoff* to be controlling, as we did in Point II, *supra,* we find that, as a matter of law, the appellant could not make a submissible case on his claims of intentional or negligent misrepresentation as pled in Counts IV and V of his first amended petition, respectively, even if we accept as true all the evidence and inferences he asserts in support of his claims, including the evidence he contends was erroneously excluded.

Point denied.

### Ryder's Cross–Appeal

Because we affirm the trial court's grant of respondent's motion for JNOV on appellant's claim for wrongful-retaliatory discharge, respondent's cross-appeal as to this claim is now moot. Thus, discerning no legitimate policy reasons for addressing respondent's mooted points raised on its cross-appeal, we decline to do so.

### Conclusion

The trial court's judgment for respondent notwithstanding the verdict as to appellant's claim for wrongful-retaliatory discharge under Count I of his first amended petition, and dismissing appellant's claims for promissory estoppel, fraudulent misrepresentation, and negligent misrepresentation under Counts III–V of appellant's first amended petition, respectively, is affirmed.

All concur.